# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF MISSOURI

| | |
|---|---|
| **CHRISTIAN BALLARD,** | ) |
| | ) |
| **and** | ) |
| | ) |
| **GREGORY WESTBROOKS,** | ) |
| | ) |
| **Plaintiffs** | ) |
| | ) |
| **v.** | )  **Case No. _____** |
| | ) |
| **NATIONAL FOOTBALL LEAGUE** | ) |
| **PLAYERS ASSOCIATION,** | ) |
| | ) |
| **Serve Registered Agent:** | ) |
| **CT Corporation System** | ) |
| **4701 Cox Road, Suite 285** | ) |
| **Glen Allen, VA  23060** | ) |
| | ) |
| | ) |
| **RAYMOND LESTER ARMSTRONG, III,** | ) |
| | ) |
| **Serve:** | ) |
| **Raymond Lester Armstrong, III** | ) |
| **422 SW 88th Terrace** | ) |
| **Gainesville, Florida  32607-1452** | ) |
| | ) |
| **TROY VINCENT,** | ) |
| | ) |
| **To Be Served At a Later Date** | ) |
| | ) |
| **and** | ) |
| | ) |
| **KEVIN MAWAE,** | ) |
| | ) |
| **To Be Served At a Later Date** | ) |
| | ) |
| **Defendants.** | ) |

## CLASS ACTION COMPLAINT

Plaintiffs Christian Ballard and Gregory Westbrooks, individually and on behalf of a Class of all others similarly situated, bring this action against Defendants National Football League Players Association ("NFLPA"), Raymond Lester Armstrong, III, also known as Trace Armstrong, Troy Vincent, and Kevin Mawae and allege as follows:

## INTRODUCTION

1.    This case seeks medical monitoring and financial compensation for the long-term chronic injuries, financial losses, expenses, and intangible losses suffered by Plaintiffs Ballard and Westbrooks, along with all other former professional football players, as a result of Defendants' intentional and negligent tortious misconduct.

2.    This action arises from the pathological and debilitating effects of traumatic brain injuries (referenced herein as "TBI") caused by concussive and sub-concussive impacts. TBI is a regular occurrence in football, and players are at an increased risk for TBI above the general population.

3.    Defendants have been aware of the evidence linking repetitive TBI to long-term neurological problems and the risks associated with repetitive traumatic brain injuries for decades, but they deliberately ignored, failed to warn, and actively concealed the information from Plaintiffs, others who participated in organized football at all levels, and the general public.

4.    Defendants' active and purposeful concealment and misrepresentation to players of the lack of any severe neurological risks of repetitive TBI exposed Plaintiffs to dangers they could have avoided or mitigated had Defendants provided them with truthful and accurate information.

## PARTIES

5.      Plaintiff Christian Ballard is an individual residing in Douglas County, Kansas.

6.      Ballard played professional football for the Minnesota Vikings in 2011 and 2012.

7.      During the years Ballard played professional football, he sustained multiple repetitive traumatic head impacts and concussions during practices and games which were never acknowledged and for which he was never treated as a player.

8.      Defendants' wrongful conduct, as alleged herein, directly caused or contributed to cause Ballard to suffer harm, including, on information and belief, chronic traumatic encephalopathy ("CTE"), a condition caused by repetitive sub-concussive and/or concussive blows to the head.

9.      Plaintiff Gregory Westbrooks is an individual residing in Jackson County, Missouri.

10.     Westbrooks played professional football for the New Orleans Saints from 1975 through 1977, for the St. Louis Cardinals in 1978, for the Oakland Raiders and Los Angeles Rams from 1978 through 1981.

11.     During the years Westbrooks played professional football, he sustained multiple repetitive traumatic head impacts and concussions during practices and games which were never acknowledged and for which he was never treated as a player.

12.     Defendants' wrongful conduct, as alleged herein, directly caused or contributed to cause Westbrooks to suffer harm, including, on information and belief, chronic traumatic encephalopathy ("CTE"), a condition caused by repetitive sub-concussive and/or concussive blows to the head.

13.     Defendant NFLPA is a Virginia corporation which maintains its headquarters at 1133 20th St NW, Suite 600, Washington, DC 20036. The NFLPA operates out of many different cities and states. The NFLPA regularly conducts business in Missouri and has held numerous

meetings in Jackson County, Missouri, hosted by NFLPA officials. The NFLPA committed tortious acts in Missouri through its fraudulent and negligent conduct, as detailed further below.

14.     Defendant Raymond Lester Amstrong, III, also known as Trace Armstrong, was president of the NFLPA from 1996 through 2004. Upon information and belief, Armstrong is a resident of Alachua County, Florida. Upon information and belief, Armstrong regularly transacted business in Missouri, including through regular contacts with players and NFLPA officers and agents. Upon information and belief, he regularly traveled to Missouri. Armstrong committed tortious acts in Missouri through his fraudulent and negligent conduct, as detailed further below.

15.     Defendant Troy Vincent was a player representative and executive vice president of the NFLPA before serving as president of the NFLPA from 2004 through 2008. Upon information and belief, Vincent is a resident of Virginia. Upon information and belief, Vincent regularly transacted business in Missouri, including through regular contacts with players and NFLPA officers and agents. Upon information and belief, he regularly traveled to Missouri. Vincent committed tortious acts in Missouri through his fraudulent and negligent conduct, as detailed further below.

16.     Defendant Kevin Mawae joined the NFLPA executive committee in 2002 and was president of the NFLPA from 2008 through 2012. Upon information and belief, Mawae is a resident of East Baton Rouge Parish, Louisiana. Upon information and belief, Mawae regularly transacted business in Missouri, including through regular contacts with players and NFLPA officers and agents. Upon information and belief, he regularly traveled to Missouri. Mawae committed tortious acts in Missouri through his fraudulent and negligent conduct, as detailed further below.

17.     Plaintiffs, during the course of their careers, paid thousands of dollars to the NFLPA as dues in the NFLPA's professional association.

18.     Defendants, through their representatives and agents, assured Plaintiffs that, as dues-paying members of the NFLPA, Defendants would protect Plaintiffs and other players' best interests and owed to Plaintiffs a fiduciary duty.

19.     Defendants, through their representatives and agents, assured Plaintiffs that they would act in the best interests of the players at all times.

20.     Of the millions of dollars received as dues from NFLPA members, including Plaintiffs, the NFLPA spent no significant funds on research and development of safer helmets, safer competition rules, or safer football equipment that could prevent or mitigate brain trauma to players, including Plaintiffs.

21.     The NFLPA failed to certify medical personnel treating players, including Plaintiffs, for head injuries, despite the NFLPA's assumption of a duty to certify agents, financial planners, and other professionals who interact with players.

22.     Plaintiffs relied on Defendants' assertions that they would act in Plaintiffs' best interests at all times and on the NFLPA's knowledge and expertise. Plaintiffs relied on Defendants to provide truthful, up-to-date and comprehensive information about the known risks of certain activities in the NFL.

## JURISDICTION AND VENUE

23.     This Court has jurisdiction under 28 U.S.C. § 1332(d) (diversity of citizenship), as this is a class action in which any member of a class of plaintiffs is a citizen of a State different from any defendant where the matter in controversy exceeds $5,000,000, exclusive of interest and costs.

24.     Venue is proper in this county pursuant to 28 U.S.C. § 1391(b).

25.     The applicable statutes of limitations with respect to the actions alleged herein has been tolled by Defendants' fraudulent concealment and other improper acts, further detailed herein and incorporated by reference. Defendants' fraudulent concealment and other improper acts prevented Plaintiffs from discovering the causes of action identified herein. Defendants had actual knowledge of the facts concealed and undisclosed. Defendants had knowledge of the falsity of their representations. Defendants had a fixed purpose and intent to prevent the commencement of an action.

## CLASS ACTION ALLEGATIONS

26.     Each Plaintiff brings this action on behalf of himself and as a class action under the provisions of Rule 23 of the Federal Rules of Civil Procedure on behalf of the members of the following Plaintiff Class:

All former or retired National Football League players.

27.     The prerequisites of Fed. R. Civ. P. 23(a) are satisfied:

28.     Numerosity:   Plaintiffs believe there are thousands of former professional football players who are members of this Class, the exact number and their identities being known to Defendant. These former professional football players are widely dispersed geographically. Joinder of all potential Class members would be impracticable.

29.     Common Questions Predominate:   There are questions of law and fact common to the Class, including, but not limited to:

    a.     Whether the NFLPA's conduct was tortious and caused Plaintiffs and Class members to be at an increased risk of latent brain injury;

    b.     Whether Plaintiffs and Class members are entitled to injunctive relief in the form of a Court-supervised medical monitoring fund.

30.    Typicality:  Plaintiffs' claims are typical of the claims of the members of the Class because each Plaintiff, like each Class member, played professional football for the National Football League and was a member of the NFLPA. Plaintiffs' claims arise from the same common course of conduct giving rise to the claims of the members of the Class and the relief sought is common to the Class.

31.    Fair and Adequate Representation:  Plaintiffs will fairly and adequately protect the interests of the Class in that Plaintiffs' interests are aligned with, and not antagonistic to, those of the other members of the Class. Plaintiffs have retained counsel competent and experienced in the prosecution of class actions to represent themselves and the Class.

32.    Class Certification is Appropriate Under Rule 23(b)(3):  The questions of law and fact enumerated in the counts below are common to all Class members, and they predominate over any questions affecting only individual members. A class action is superior to other available methods for fairly and efficiently adjudicating the controversy. Individual joinder of all damaged Class members is impractical. Prosecution as a class action will eliminate the possibility of repetitious litigation. The damages sought herein suffered by individual class members are relatively small given the expense and burden of individual prosecution of the claims asserted in this litigation.  Absent a class action, it would not be feasible for Class members to seek redress for the violations of law herein alleged. Further, individual litigation presents the potential for inconsistent or contradictory judgments and would greatly magnify the delay and expense to all parties and to the court system. Therefore, a class action presents far fewer case management difficulties and will provide the benefits of unitary adjudication, economy of scale, and comprehensive supervision by a single court.

## GENERAL ALLEGATIONS APPLICABLE TO ALL COUNTS

### The NFLPA was in a Superior Position of Knowledge and
### Knew the Dangers and Risks Associated with Repetitive Head Impacts and Concussions

33.     At all times, Defendants have had unparalleled access to and knowledge of data relating to the relationship between head impacts on football players and cognitive decline. This access to and knowledge of data comes from Defendants' awareness of the growing body of scientific literature on the subject, the NFLPA's own medical consultants, the NFLPA's requested or commissioned studies on the subject, the NFLPA's participation in the Retirement Board of the Bert Bell/Pete Rozelle NFL Player Retirement Plan ("Retirement Board"), and the NFLPA's participation in the Mild Traumatic Brain Injury Committee (the "MTBI Committee").

34.     For decades, for example, the NFLPA has been aware that multiple blows to the head can lead to long-term brain injury, including but not limited to memory loss, dementia, and depression. It has also been aware that former NFL players have been suffering from long-term brain injuries.

35.     As a further example, the NFLPA has known for years that once a person suffers a TBI, he is up to four times more likely to sustain a second one. Additionally, the NFLPA, for a long time, has known that after suffering even a single sub-concussive or concussive blow, a lesser blow may cause TBI, and the injured person requires more time to recover.

36.     Despite this knowledge, Defendants did not inform players, including Plaintiffs, of the risks of long-term brain injury from playing football or that their long-term brain injuries were related to their professional football career.

37.     On information and belief, the NFLPA received and paid for advice from medical consultants regarding health risks associated with playing football, including the health risks associated with concussive and sub-concussive injuries.

38.     When presented with information from such medical consultants regarding health risks associated with concussive and sub-concussive injuries, Defendants ignored, concealed, and turned a blind eye to such information.

39.     The NFLPA also requested and/or financed research regarding the link between head impacts and cognitive decline.

40.     On January 10, 1994, the NFLPA received a report at its request from the National Institute for Occupational Safety and Health ("NIOSH") on the mortality study investigating the rate and causes of death of NFL players. That report noted an increase in nervous system disorders, including four cases of amyotrophic lateral sclerosis (ALS), also known as Lou Gehrig's disease, and suggested further follow-up over time to determine whether the increase was due to chance.

41.     Rather than informing the players of the results regarding nervous system disorders or even of NIOSH's suggestion of further follow-up when it received the study results, the NFLPA instead concealed the results of the study. Defendants further supplied false and misleading information regarding the risk of harm to then-current and former professional football players, their families, and the general public.

42.     In May 2012, after further research was done by NIOSH, Defendants touted the study's conclusion that NFL players have a much lower death rate than men in the general population.

43.     The NFLPA also authorized thousands of dollars in grants to finance research by the University of North Carolina's Center for the Study of Retired Athletes.

44.     From 2004 through 2007, the NFLPA received information from the Center for the Study of Retired Athletes indicating a substantial link between head impacts and cognitive decline.

45.     Despite this knowledge, Defendants consistently concealed, ignored, and turned a blind eye to the studies' results. Defendants supplied false and misleading information regarding the risk of harm to professional football players.

46.     Additionally, the NFLPA obtained knowledge regarding the link between multiple concussions suffered during a player's NFL career and cognitive decline through its participation in the Retirement Board.

47.     The seven-person Retirement Board, of which six are voting members, includes three voting members chosen by the NFLPA.

48.     The NFLPA, through its representation on the Retirement Board, not only knew of the link between multiple concussions and cognitive decline, but it also accepted that repetitive traumatic brain injuries sustained by players led to total and permanent mental disability.

49.     In the 1990s and early 2000s, the Retirement Board awarded millions of dollars to players with total and permanent disability benefits that stemmed directly from repetitive traumatic brain injuries they sustained during their NFL careers.

50.     For example, in 1999, former NFL player Mike Webster filed with the Retirement Board a request that he receive complete disability benefits based on the fact that he had sustained repeated and disabling head impacts while an NFL player. He submitted extensive medical reports and testimony that stated he suffered from traumatic or punch drunk encephalopathy brain disease sustained from playing football that left him totally and permanently disabled as of 1991, the year he retired from active play.

51.     The Retirement Board's own physician independently examined Webster and concluded that Webster was completely mentally disabled as of the date of his retirement and was certainly disabled when he stopped playing football.

52.     The NFLPA appointees to the Retirement Board granted Webster total and permanent disability benefits. The Retirement Board "determined that Mr. Webster's disability arose while he was an Active Player. The medical reports in Mr. Webster's file, including the reports of neutral physician

Dr. Edward Westbrook, Dr. James Vodvarka, and Dr. Jonathan Himmelhoch, indicate that his disability is the result of head injuries he suffered as a football player with the Pittsburgh Steelers and Kansas City Chiefs."

53.     Additionally, Defendants received voluminous complaints and had knowledge of claims filed by players regarding their inability to work due to concussions and head injuries.

54.      Defendants' accumulated knowledge about head injuries to players and the associated health risks therefrom was at all times vastly superior to that available to Plaintiffs.

55.     Despite their knowledge and acceptance of the link between concussive and sub-concussive hits and cognitive decline, Defendants continued to actively and purposefully conceal and misrepresent the severe neurological risks of repetitive TBI.

**Defendants Not Only Fraudulently Concealed the Long-Term Effects of Head Impacts on Cognitive Decline, They Fraudulently Misrepresented that there was No Link Between the Two.**

56.     Through its own initiative and voluntary undertaking, the NFLPA decided to fund and/or directly participate in the MTBI Committee, ostensibly created by the NFL to research and study TBI affecting NFL players. Through the MTBI Committee, the NFLPA voluntarily inserted itself into the private and public discussion and research on an issue that goes to the core safety risk for players who participate at every level of the game. Through its voluntary acts, the NFLPA affirmatively assumed a duty to use reasonable care in the study of concussions and post-concussion syndrome in NFL players; the study of any kind of brain trauma relevant to the sport of football; the use of information developed; and the publication of data and/or pronouncements from the MTBI Committee.

57.     Rather than exercising reasonable care in its voluntarily-undertaken duties, the NFLPA immediately engaged in a long-running course of fraudulent and negligent conduct, which included a campaign of disinformation designed to (a) dispute accepted and valid neuroscience regarding the

connection between repetitive traumatic brain injuries or concussions and degenerative brain disease such as CTE; and (b) to create a falsified body of research which the NFLPA could cite as proof that truthful and accepted neuroscience on the subject was inconclusive and subject to doubt.

58.     Before the NFLPA voluntarily inserted itself into the discussion through the MTBI Committee, numerous studies were published in medical journals, including the *Journal of the American Medical Association*, *Neurology*, the *New England Journal of Medicine*, and *Lancet*, warning of the dangers of single concussions, multiple concussions, and/or football-related head trauma from multiple concussions. Collectively, these studies established that:

a.      repetitive head trauma in contact sports, including boxing and football, has potential dangerous long-term effects on brain function;

b.      encephalopathy (dementia pugilistica) is caused in boxers by repeated sub-concussive and concussive blows to the head;

c.      acceleration and rapid deceleration of the head that results in brief loss of consciousness in primates also results in a tearing of the axons (brain cells) within the brainstem;

d.      with respect to mild head injury in athletes who play contact sports, there is a relationship between neurologic pathology and length of the athlete's career;

e.      immediate retrograde memory issues occur following concussions;

f.      mild head injury requires recovery time without risk of subjection to further injury;

g.      head trauma is linked to dementia;

h.      a football player who suffers a concussion requires significant rest before being subjected to further contact; and,

minor head trauma can lead to neuropathological and neurophysiological alterations, including neuronal damage, reduced cerebral blood flow, altered brainstem evoked potentials and reduced speed of information processing.

59.     Defendants' response to the issue of brain injuries and degenerative brain disease in current and retired NFL players was a concerted effort of deception and denial. Defendants actively

tried to and did conceal the extent of the concussion and brain trauma problem, the risk to Plaintiffs, and the risks to all persons who played football at any level.

60.     From its inception, the MTBI Committee allegedly began conducting studies to determine the effect of concussions on the long-term health of NFL players. Ultimately, however, it spearheaded a disinformation campaign and worked to discredit scientific studies that linked head impacts and concussions received by NFL players to neurocognitive disorders and disabilities.

61.     The MTBI Committee published its findings in a series of sixteen papers between 2003 and 2009. According to the MTBI Committee, all of their findings supported a conclusion that there was no long-term negative health consequence associated with concussions or sub-concussive injuries sustained by NFL players. These findings regularly contradicted the research and experiences of neurologists who treat sports concussions.

62.     In its first publication in 2003, the MTBI Committee stated, contrary to years of independent findings otherwise, that there was no long-term negative health consequence associated with concussions.

63.     In 2004, the MTBI Committee published a conclusion in which it claimed that its research found no risk of repeated concussions in players with previous concussions and that there was no "7-to-10 day window of increased susceptibility to sustaining another concussion."

64.     As a further example, an MTBI Committee conclusion in 2005 stated that "[p]layers who are concussed and return to the same game have fewer initial signs and symptoms than those removed from play. Return to play does not involve a significant risk of a second injury either in the same game or during the season." The MTBI Committee reported that "These data suggest that these players were at no increased risk" of subsequent concussions or prolonged symptoms such as memory loss, headaches, and disorientation.

65.     Members of the MTBI Committee repeatedly stated that their studies showed "no evidence of worsening injury or chronic cumulative effects of multiple [TBI] in NFL players."

66.     Other conclusions contrary to the weight of scientific evidence that the MTBI Committee published at the behest, urging, and sponsorship of the NFLPA over several years include, but are not limited to, the following:

>        a.      Drs. Pellman and Viano stated that because a "significant percentage of players returned to play in the same game [as they suffered a concussion] and the overwhelming majority of players with concussions were kept out of football-related activities for less than 1 week, it can be concluded that mild [TBIs] in professional football are not serious injuries";
>
>        b.      that NFL players did not show a decline in brain function after a concussion;
>
>        c.      that there were no ill effects among those who had three (3) or more concussions or who took hits to the head that sidelined them for a week or more;
>
>        d.      that "no NFL player experienced the second-impact syndrome or cumulative encephalopathy from repeat concussions"; and
>
>        e.      that NFL players' brains responded and healed faster than those of high school or college athletes with the same injuries.

67.     The MTBI Committee's papers and conclusions were against the weight of the scientific evidence and based on biased data collection techniques. They received significant criticism in the scientific and medical media from independent doctors and researchers and were met with skepticism in peer review segments following each article's publication.

68.     The results reported by the MTBI Committee selectively excluded at least 850 baseline tests. In a paper published in *Neurosurgery* in December 2004, MTBI Committee members reported on the baseline data for 655 players and the results for 95 players who had undergone both baseline testing and post-concussion testing. They concluded that NFL players did not show a decline in brain function after suffering concussions. Their further analysis purportedly found no ill effects among those who

had three or more concussions or who took hits to the head that kept them out for a week or more. The paper did not explain where the players in the study groups came from specifically or why certain player data was included and that data from hundreds of other players was not.

69.     As described in the following paragraphs, when faced with studies which tended to show a causal link between TBI and cognitive degeneration, the NFLPA, through the MTBI Committee, produced contrary findings that were false, distorted, and deceptive to NFL players, their families, participants in football nationwide, and the public at large.

70.     Between 2002 and 2007, Dr. Bennet Omalu examined the brain tissue of deceased NFL players, including Mike Webster, Terry Long, Andre Waters, and Justin Strzelczyk, all of whom suffered multiple concussions during their NFL career and all of whom exhibited symptoms of deteriorated cognitive functions, paranoia, panic attacks, and depression later in life. Dr. Omalu concluded that the players suffered from CTE.

71.     Some of Dr. Omalu's findings were published in *Neurosurgery*, including the findings that Webster's and Long's respective deaths were partially caused by CTE and were related to multiple concussions suffered during their activity in the NFL.

72.     In response to Dr. Omalu's articles, the MTBI Committee wrote a letter to the editor of *Neurosurgery* asking that Dr. Omalu's article be retracted.

73.     In an article published in *Neurosurgery* in 2007, Dr. Robert Cantu reached a similar conclusion regarding Waters as Dr. Omalu had reached as to Webster and Long.

74.     A 2003 study partially authored by Dr. Kevin Guskiewicz analyzed data from almost 2,500 retired NFL players and found that 263 of the retired players suffered from depression. The study found that having three or four concussions meant twice the risk of depression as never-concussed players and five or more concussions meant a nearly threefold risk.

75.     The MTBI Committee attacked these studies.

76.     In November 2003, Dr. Guskiewicz was scheduled to appear on HBO's "Inside the NFL" to discuss his research. On the program, Dr. Pellman, a rheumatologist who does not specialize in the diagnosis and treatment of concussions and the then-chair of the MTBI Committee, stated unequivocally that he did not believe the results of the study led by Dr. Guskiewicz.

77.     In 2005, Dr. Guskiewicz performed a clinical follow-up study, and found that retired players who sustained three or more concussions in the NFL had a five-fold prevalence of mild cognitive impairment in comparison to NFL retirees without a history of concussions. In doing this research, Dr. Guskiewicz conducted a survey of over 2,550 former NFL athletes.

78.     The MBTI Committee attacked and sought to undermine the study, issuing the following excuse and delay tactic:  "We want to apply scientific rigor to this issue to make sure that we're really getting at the underlying cause of what's happening. . . . You cannot tell that from a survey."

79.     In 2007, in a televised interview on HBO's Real Sports, Dr. Casson, then-co-chair of the MTBI Committee, unequivocally stated that there was no link between concussions and depression, dementia, Alzheimer's disease, or "anything like [that] whatsoever."

80.     In 2008, Boston University's Dr. Ann McKee found CTE in the brains of two more deceased NFL players, John Grimsley and Tom McHale. Dr. McKee stated, "the easiest way to decrease the incidence of CTE [in contact sport athletes] is to decrease the number of concussions." Dr. McKee further noted that "[t]here is overwhelming evidence that [CTE] is the result of repeated sublethal brain trauma."

81.     A representative of the MTBI Committee characterized each study as an "isolated incident" from which no conclusion could be drawn and said he would wait to comment further until

Dr. McKee's research was published in a peer-reviewed journal. When Dr. McKee's research was published in 2009, Dr. Casson, on behalf of the MTBI Committee, asserted that "there is not enough valid, reliable or objective scientific evidence at present to determine whether . . . repeat head impacts in professional football result in long[-]term brain damage."

82.     The promulgated conclusions of the NFLPA, through the MTBI Committee, completely contradicted the NFLPA's knowledge from the growing body of scientific literature on the subject, its own medical consultants, its own requested and commissioned studies on the subject, and its participation in the Retirement Board.

83.     Defendants have for decades ignored, turned a blind eye to, and actively concealed the risks to players of repetitive sub-concussive and concussive head impacts.

84.     In October 1999, Gene Upshaw, then-Executive Director of the NFLPA, stated "I don't think you can legislate this. We in the NFL are very aware of this problem. Look at the position – normally, (the injured player) is the highest-paid player. We think we take every precaution."

85.     After Andre Waters, a former safety for the Philadelphia Eagles, committed suicide, a neuropathologist said Waters' depression might have been related to the concussions he sustained as a professional football player. In January 2007, Gene Upshaw, then-Executive Director of the NFLPA, "sounded annoyed" by Chris Nowinski's assessment, according to one reporter, stating "I think everyone is getting a little riled up because this guy's out there trying to sell this damn book," an apparent reference to Nowinski's book "Head Games:  Football's Concussion Crisis."

86.     Upshaw also stated in January 2007 that "We all get alarmed when we see something like this," in a reference to an article about Waters. "But it's not like we've been just sitting on our hands. That's what's being implied here, that no one is looking at this, that no one's studying this, that

no one cares about this. If that was true, I'm irresponsible and I haven't been doing my job, and neither has the N.F.L."

87.     With respect to the idea that a football player who sustains a concussion should not return to the same game in which the injury occurred and should be held out for at least one more game, Upshaw stated "The last thing that we want to do and the N.F.L. wants to do, and it's the last thing I want to do as a union, is to mandate something that's not medically proven. That's why we have doctors."

88.     Dr. Thomas Mayer, the NFLPA's medical adviser, stated in January 2007 that "They're protected as well as they can be. But this is a warrior mentality, this is a warrior sport."

89.     In 2007, Gene Upshaw, then-Executive Director of the NFLPA, stated "I think we're just a reflection of society." He further stated "I don't want to take that next leap to say, you know, football caused dementia. I just don't believe that."

90.     In February 2007, at a news conference in Miami on the Thursday before Super Bowl Sunday, stated that concussions are one issue the union was studying that year. Upshaw also stated: "We've seen a number of concussions in the NFL this year, and as a result of our studies, we've seen a change in the helmet. We're also studying the effects of that on concussions."

91.     In June 2007, Vincent stated "I'm not sure if we – athletes – know what a concussion is." In keeping with the theme of a warrior mentality where warriors should not question whether a concussion impacts their future health, Vincent stated "Who wants to come out of the game? No player wants to sit on the sidelines."

92.     In December 2008, in keeping with its scheme of fraud and deceit, the NFLPA issued a letter on its letterhead to retirees stating that it was "supporting and endorsing" an NFL study of retired

players and "trying to determine if there are possible long-term effects on the brain from playing in the N.F.L."

93.     The implication of the NFLPA's December 2008 letter—that the question of long-term effects of concussive and sub-concussive hits on cognitive decline remained open despite decades of science to the contrary—mirrored the NFL's pronouncement from a year and a half earlier in its concussion pamphlet, which stated "Current research with professional athletes has not shown that having more than one or two concussions leads to permanent problems if each injury is managed properly. It is important to understand that there is no magic number for how many concussions is too many.  Research is currently underway to determine if there are any long-term effects of concussion[s] in NFL athletes."

94.     Defendants' comments and representations to the players were a concerted attempt to hide and conceal the truth, which was that TBI was a common occurrence among the NFLPA's members.

95.     In or around September 2009, after the NFLPA analyzed data from the 88 Plan, a joint program with the NFL to reimburse retirees for medical expenses deriving from dementia, it asserted that NFL retirees were experiencing dementia at a rate similar to the general population. This assertion was flawed, incorrect, and related, in part, to mathematical and methodological errors. In reality, football retirees between ages 60 and 89 likely suffer from moderate dementia at a rate of four to five times that of the general population.

96.     In November 2010, after the NFL fined players for what it determined were illegal hits to the head, Mawae stated he would not support the NFL on the fines; "For the commissioner and for the NFL to say they are going to increase fines because hits seem to be vicious or violent—I think it's ridiculous and I think the skirt needs to be taken off in the NFL offices."

97.     In December 2010, Dr. Mayer stated that the medical arm of the NFLPA had "a very close relationship when it comes to making sure we are protecting the players to the maximum degree possible" with the NFL's medical arm.

98.     Plaintiffs relied to their detriment on the Defendants' misinformation, all of which was contrary to the findings of the independent scientists who had studied the issue regarding the causal link between multiple head injuries and cognitive decline.

## The Congressional Inquiry into the Concussion Crisis

99.     In October 2009, Representative John Conyers, Jr., Chairman of the House Judiciary Committee, called for hearings on the impact of head injuries sustained by NFL players.

100.     In a written statement to Congress, DeMaurice Smith, Executive Director of the NFLPA, wrote that "As Executive Director, my number one priority is to protect those who play and have played this game. There is no interest greater than their health and safety. Let me say this again: Safety of the Players is Paramount."

101.     Smith wrote that he had "one simple declaration" for those who play and have played football at all levels:  "WE ARE COMMITTED TO GETTING THE RIGHT ANSWERS, TO WORK WITH EVERYONE WHO HAS THE GOAL OF PROTECTING OUR PLAYERS AND TO SERVE AS A MODEL FOR FOOTBALL AT EVERY LEVEL." Smith further wrote:  "Given that commitment, I acknowledge that the Players Union in the past has not done its best in this area."

102.     Smith also wrote that "we, the players, will not bargain for medical care; we will not bargain for health and safety; and we will not bargain for basic provisions of the law as patients. We will continue to work with the League but medical care is not and will never be a Collective Bargaining issue."

103.    Smith further wrote that "While there is greater cooperation between the NFL and the Players Association through the NFL's MTBI Committee, the players believe that it is important to have an objective Committee that is free from any appearance of conflict of interest."

104.    In discussing some of the MTBI Committee's studies and its response to the independent studies discussed above, Smith stated "as we learn more about this issue, one thing becomes clear:  the days of denigrating, suppressing, and ignoring the medical findings must come to an end. We need to share the right information, embrace the right researchers and collectively find the right answers."

105.    At further hearings before the House Judiciary Committee, Smith testified "There is simply no justification for the NFL to have previously ignored or discredited Dr. Omalu and others with relevant, valid research. For far too long, our former players were left adrift, as I emphasized at the last hearing, we were complicit in the lack of leadership and accountability but that ends now."

106.    Yet, Dr. Casson continued to follow the mantra of the MTBI Committee, testifying that "[t]here is not enough valid, reliable or objective scientific evidence at present to determine whether or not repeat head impacts in professional football result in long term brain damage."

107.    When the suicide of former player Dave Duerson and later determination that he had been suffering from CTE was reported, NFLPA Executive Director DeMaurice Smith admitted prior shortcomings of the NFLPA, stating that the fact that Duerson was suffering from CTE:

> "makes it abundantly clear what the cost of football is for the men who played and the families. It seems to me that any decision or course of action that doesn't recognize that as the truth is not only perpetuating a lie, but doing a disservice to what [Duerson] feared and what he wanted to result from the donation of his brain to science."

108.    In October 2011, the Head, Neck, and Spine Medical Committee, which replaced the MTBI Committee, announced that a new study was in the planning process and that the MTBI

Committee's previous long-range study was useless because "[t]here was no science in that." Data from the previous study would not be used: "We're really moving on from that data. There's really nothing we can do with that data in terms of how it was collected and assessed."

109.    It took decades for Defendants to admit that there was a problem or to admit that multiple blows to the head can lead to long-term brain injury, including memory loss, dementia, depression, and CTE and its related symptoms. It took years for Defendants to admit that the information they promulgated was false and inaccurate. Defendants' conduct in this regard is willful and wanton and exhibits a reckless disregard for the safety of the players and the public at large. At a minimum, Defendants acted with callous indifference to the duty they voluntarily assumed to players, including Plaintiffs, players' families, and players at every level of the game.

110.    As a direct result of the fraudulent concealment and misrepresentations by Defendants, former players, including Plaintiffs, have for many decades been led to believe that the symptoms of early-onset dementia, ALS, CTE, loss of memory, headaches, confusion, and the inability to function were not caused by events that had occurred while they played in the NFL. And, as a result of this willful and malicious conduct, these former players, including Plaintiffs, were deprived of the ability to make an informed decision regarding continuing to play football or seek competent independent medical treatment and advice. In addition, these former players, including Plaintiffs, delayed seeking medical treatment, incurred expenses, lost employment, suffered humiliation, and sustained other damages to be specified.

## COUNT I
## FRAUDULENT CONCEALMENT
### (Against All Defendants)

111.    Plaintiffs restate and incorporate by reference the preceding paragraphs set forth above as if fully set forth herein.

112.    Defendants knew that repetitive head impacts in football games and full-contact practices created a risk of harm to football players. During the respective times they served on the NFLPA's executive committee or in a position such as president of the NFLPA, Armstrong, Vincent, and Mawae gained the same knowledge as the NFLPA.

113.    Defendants knowingly and fraudulently concealed from then-current and former professional football players, their families, and the public, including future NFLPA members such as college, high school, and grade-school football players, the risks of head injuries in games and practices, including the risks associated with returning to physical activity too soon after sustaining a sub-concussive or concussive injury.

114.    Defendants' concealment of material facts and information was with the intent to deceive and defraud.

115.    Given Defendants' superior and unique vantage point, Defendants had a duty to disclose their knowledge to Plaintiffs.

116.    This demonstrably superior knowledge on the part of Defendants was not within the fair and reasonable reach of Plaintiffs.

117.    The concealment was ongoing. For example, in December 2008, the NFLPA issued a letter to retirees that it was still trying to determine if there are possible long-term effects on the brain from playing in the NFL. For further example, an MTBI Committee member provided oral and written testimony at the 2010 congressional hearings in which he continued to deny the validity of other studies.

118.    Defendants knew or reasonably should have known that Plaintiffs would rely on Defendants' silence and misinformation on this vital health issue.

119.    Plaintiffs in fact did reasonably rely on Defendants' silence and misinformation during and after their professional football careers.

120.    Defendants' concealment caused Plaintiffs to become further exposed to the harm referenced above. Defendants' concerted concealment of the risks to which Plaintiffs had been exposed on the playing field delayed their ability to plan for their own futures and their families' futures and to seek appropriate treatment of their latent neurodegenerative conditions. As a direct and proximate result of Defendants' fraudulent conduct, Plaintiffs suffered physical injury. As a further direct and proximate result of Defendants' willful concealment, Plaintiffs have suffered and will continue to suffer substantial injuries, emotional distress, pain and suffering, and economic and non-economic damages that are ongoing and continuing in nature.

121.    As a result of Defendants' misconduct as alleged herein, Defendants are liable to Plaintiffs for, and Plaintiffs seek, the full measure of damages allowed under applicable law, including punitive damages.

### COUNT II
### FRAUD
### (Against All Defendants)

122.    Plaintiffs restate and incorporate by reference the preceding paragraphs set forth above as if fully set forth herein.

123.    Defendants knew that repetitive head impacts in football games and full-contact practices created a risk of harm to all football players. During the respective times they served on the NFLPA's executive committee or in a position such as president of the NFLPA, Armstrong, Vincent, and Mawae gained the same knowledge as the NFLPA.

124.    Defendants knowingly and fraudulently concealed from then-current and former professional football players the risks of head injuries in NFL games and practices, including the risks

associated with returning to physical activity too soon after sustaining a sub-concussive or concussive injury.

125.    Defendants voluntarily participated in and sought out purported scientific research and through that research repeatedly misrepresented to then current and former NFL players, including Plaintiffs, their families, and the general public, including persons playing non-professional football, that there is no link (or an insufficient scientific link) between TBI in NFL activities and later-in-life cognitive/brain injury, including CTE and its related symptoms.

126.    Defendants promulgated misleading information to players, their families, and the general public, all of which concealed and minimized the risks of repetitive brain impacts Defendants knew existed for the then-current players and for the former players, who reasonably relied on Defendants' pronouncements and/or silence on this vital health issue.

127.    Defendants' actions and pronouncements on the subject created an atmosphere of trust that Defendants had carefully undertaken their voluntarily assumed responsibilities to report accurate findings.

128.    Defendants and their agents—employed to formulate the MTBI Committee and populate the published scientific literature with misleading "studies" intent on disputing the conclusions of independent researchers regarding the long-term chronic disabilities and injuries associated with head injury—made these material misrepresentations with the intent to defraud Plaintiffs.

129.    Given Defendants' superior and unique vantage point, Plaintiffs reasonably looked to Defendants for guidance on head injuries and concussions.

130.    During their playing days and after their retirement from professional football, Plaintiffs, who were ignorant of the truth or falsity of Defendants' representations, justifiably and reasonably relied on Defendants' omissions and misrepresentations to their detriment.

131.    As a direct and proximate result of Defendants' fraudulent conduct, Plaintiffs have suffered physical injury. Plaintiffs were damaged by Defendants' misconduct and have suffered and will continue to suffer substantial injuries, emotional distress, pain and suffering, and economic and non-economic damages that are ongoing and continuing in nature.

132.    As a result of Defendants' fraud, Defendants are liable to Plaintiffs for, and Plaintiffs seek, the full measure of damages allowed under applicable law, including punitive damages.

**COUNT III**
**NEGLIGENT MISREPRESENTATION**
**(Against All Defendants)**

133.    Plaintiffs restate and incorporate by reference the preceding paragraphs set forth above as if fully set forth herein.

134.    In the course of their business and/or because of a pecuniary interest, Defendants supplied information regarding the risk of harm to professional football players, including Plaintiffs, based upon repetitive traumatic impacts to the head.

135.    Defendants knew that repetitive head impacts in football games and practices created a risk of harm to NFL players.

136.    Defendants were aware of and understood the significance of the published medical literature demonstrating the serious risk of both short-term and long-term adverse consequences from the kind of repetitive traumatic impacts to the head to which NFL players were exposed.

137.   During Plaintiffs' playing careers, including while Plaintiffs were members of the NFLPA, Defendants withheld this information from and ignored the risks to NFL players, former players, and the general public.

138.   Defendants made material misrepresentations to then-current NFL players, former players, the United States Congress, and the public at large that there was no scientifically proven link between repetitive traumatic head impacts and later-in-life cognitive injury, including CTE and its related symptoms.

139.   Because of a failure by Defendants to exercise reasonable care, the information supplied by Defendants was false.

140.   Defendants, therefore, misrepresented before, during, and after their playing years the dangers Plaintiffs faced when they returned to practices and games after sustaining a sub-concussive and/or concussive head impact and the long-term effects of continuing to play football after such a head injury.

141.   Defendants made public statements, published articles, and made representations to players which Defendants knew or should have known were misleading in that they downplayed, denied, and obfuscated to NFL players the true and serious risks of repetitive traumatic head impacts.

142.   Defendants' misrepresentations included the false statement that the NFLPA was supporting and endorsing an NFL study of retired players and "trying to determine if there are possible long-term effects on the brain from playing in the N.F.L."

143.   Defendants' misrepresentations included ongoing and baseless criticism of legitimate scientific studies that set forth the dangers and risks of head impacts which NFL players regularly sustained.

144.    Defendants intentionally provided this false information to Plaintiffs.

145.    Plaintiffs' reliance on any and all of Defendants' pronouncements on this subject was reasonable, given Defendants' superior and unique vantage point on these issues.

146.    Defendants made these misrepresentations and actively concealed true information at a time when they knew, or should have known, because of their superior position of knowledge, that Plaintiffs faced serious health problems if they returned to a game too soon after sustaining a concussion.

147.    Defendants knew or should have known the misleading nature of their statements when they were made.

148.    Defendants made the misrepresentations and actively concealed information knowing that Plaintiffs would and did rely on the misrepresentations and/or omissions in, among other things, how Plaintiffs addressed the concussive and sub-concussive injuries they sustained and in whether Plaintiffs continued to play football.

149.    As a result of Defendants' misrepresentations, they are liable to Plaintiffs.

150.    As a direct and proximate result of Defendants' fraudulent conduct, Plaintiffs have suffered physical injury. Plaintiffs seek the full measure of damages allowed under applicable law.

**COUNT IV**
**<u>NEGLIGENCE</u>**
**<u>(Against All Defendants)</u>**

151.    Plaintiffs restate and incorporate by reference the preceding paragraphs set forth above as if fully set forth herein.

152.    Defendants knew or should have known that repetitive sub-concussive and concussive blows to the heads of professional football players can and do result in short-term and long-term brain damage.

153.    Defendants knew or should have known that it was the practice to compel or cajole players to play with injuries, including sub-concussive injuries, concussive injuries and injuries involving a loss of consciousness.

154.    Defendants had superior knowledge as compared to the Plaintiffs that athletic sporting events causing sub-concussive and concussive injuries posed a serious risk of short-term and long-term cognitive disabilities.

155.    Given Defendants' superior and unique vantage point on the issue of head injuries and concussions, Plaintiffs reasonably relied to their detriment on Defendants' actions and omissions on the subject.

156.    Defendants were further negligent in that they failed to publicize to Plaintiffs, to active players, and to the public at large, including retired players, the mounting evidence in the scientific literature of the evolving and chronic neuro-cognitive problems among former players. This failure caused then-current players and retired players to believe that their physical and psychological problems were neither serious nor related to football. These commissions and/or omissions caused Plaintiffs to ignore the need for necessary treatment and to suffer further damages.

157.    Defendants voluntarily undertook to study and report on the issue of neurocognitive injuries in former professional football players. In doing so, Defendants assumed a duty to exercise reasonable care in their work and in public statements about the substance of their work.

158.    Defendants recognized that their voluntary undertaking to study and report information about the effect of head impacts on professional football players would not just be for the benefit of then-present and former players alone. The NFLPA knew or should have known that its pronouncements and the statements of its agents and representatives would have a broad public impact.

159.   Defendants and their agents, including the MTBI Committee, negligently performed Defendants' voluntarily undertaken duties.

160.   In addition, Defendants and their agents, including the MTBI Committee, made material misrepresentations to Plaintiffs, current players, former players, the United States Congress, and the public at large that there was no scientifically valid link between repetitive traumatic head impacts and later-in-life cognitive/brain injury, including CTE and its related symptoms.

161.   Defendants' failure to exercise reasonable care in its voluntarily assumed duties increased the risk that Plaintiffs would suffer long-term neurocognitive injuries.

162.   Plaintiffs reasonably relied to their detriment on Defendants' actions and/or omissions on the subject.

163.   Under all of the above circumstances, it was foreseeable that Defendants' failure to exercise reasonable care in the execution of its voluntarily undertaken duties would cause or substantially contribute to the injuries and damages suffered by Plaintiffs.

164.   As a direct and proximate result of Defendants' negligent conduct, Plaintiffs have suffered physical injury. Plaintiffs seek the full measure of damages allowed under applicable law.

**COUNT V**
**NEGLIGENT HIRING**
**(Against the NFLPA)**

165.   Plaintiffs restate and incorporate by reference the preceding paragraphs set forth above as if fully set forth herein.

166.   The NFLPA voluntarily and gratuitously inserted itself into the business of studying and subsequently rendering expert opinions about the relationship between repetitive head impacts in football and brain injury.

167.    In doing so, the NFLPA assumed a duty to all future, current and former NFL players, including Plaintiffs, and to the general public to (a) retain and employ persons within the MTBI Committee who were professionally competent to study and render opinions on the relationship between repetitive head impacts in football and brain injury; (b) ensure that those whom it hired had no conflict of interest; (c) ensure that each had the professional and personal qualifications to conduct those studies and render opinions that were scientifically rigorous, valid, defensible, and honest; and (d) make sure that those it hired were skilled and competent.

168.    The NFLPA breached its duty of reasonable care to the general public and to Plaintiffs by hiring persons who:

a.    were unqualified;

b.    were not skilled or competent to engage in rigorous and defensible scientific research;

c.    were not skilled or competent to render valid and defensible opinions;

d.    created fraudulent industry-funded research; and/or

e.    attacked as not credible the valid and defensible research and opinions generated by independent neuro-scientists.

169.    The NFLPA knew or should have known that the persons it hired were unqualified, were not skilled or competent to engage in rigorous and defensible scientific research, were not skilled or competent to render valid and defensible opinions, would create and/or created fraudulent industry-funded research, and/or would attack and/or attacked as not credible the valid and defensible research and opinions generated by independent neuro-scientists.

170.    Despite its knowledge or what it should have known, the NFLPA hired those persons, who proceeded to act consistently with the aforementioned proclivities.

171.    The NFLPA's negligence in this regard resulted in a body of falsified research that purposefully and/or negligently contested and suppressed valid and truthful bio-medical science. The NFLPA's negligence allowed the MTBI Committee to use falsified research to mislead Plaintiffs, future, current, and former professional football players, and the general public regarding the risks associated with repetitive head impacts in the game of football.

172.    As a direct and proximate result of the NFLPA's negligent conduct, Plaintiffs have suffered physical injury. Plaintiffs have suffered and continues to suffer serious personal injury, including neuro-cognitive brain disease and associated damages including mental disability, loss of income, pecuniary loss, economic loss, non-economic loss, pain and suffering, and emotional distress. Plaintiffs seek the full measure of damages allowed under applicable law.

## COUNT VI
## NEGLIGENT RETENTION
## (Against the NFLPA)

173.    Plaintiffs restate and incorporate by reference the preceding paragraphs set forth above as if fully set forth herein.

174.    The NFLPA voluntarily and gratuitously inserted itself into the business of studying and subsequently rendering expert opinions about the relationship between repetitive head impacts in football and brain injury.

175.    In doing so, the NFLPA assumed a duty to all future, current and former NFL players, including Plaintiffs, and to the general public to (a) retain and employ persons within the MTBI Committee who were professionally competent to study and render opinions on the relationship between repetitive head impacts in football and brain injury; (b) ensure that those

whom it hired had no conflict of interest; (c) ensure that each had the professional and personal qualifications to conduct those studies and render opinions that were scientifically rigorous, valid, defensible, and honest; and (d) make sure that those it hired were skilled and competent.

176.    During the time period when the MTBI Committee was conducting its purported research and rendering its purported opinions, the NFLPA knew or should have known that the purported research and opinions of the MTBI Committee were false and indefensible.

177.    The NFLPA breached its duty of reasonable care to the general public and to Plaintiffs by hiring and retaining persons who:

   a.    were unqualified;

   b.    were not skilled or competent to engage in rigorous and defensible scientific research;

   c.    were not skilled or competent to render valid and defensible opinions;

   d.    created fraudulent industry-funded research; and/or

   e.    attacked as not credible the valid and defensible research and opinions generated by independent neuro-scientists.

178.    The NFLPA knew or should have known that the persons it hired and retained were unqualified, were not skilled or competent to engage in rigorous and defensible scientific research, were not skilled or competent to render valid and defensible opinions, would create and/or created fraudulent industry-funded research, and/or would attack and/or attacked as not credible the valid and defensible research and opinions generated by independent neuro-scientists.

179.   Despite its knowledge or what it should have known, the NFLPA hired and continued to retain those persons, who proceeded to act consistently with the aforementioned proclivities.

180.   The NFLPA's negligence in this regard resulted in a body of falsified research that purposefully and/or negligently contested and suppressed valid and truthful bio-medical science. The NFLPA's negligence allowed the MTBI Committee to use falsified research to mislead Plaintiffs, future, current, and former professional football players, and the general public regarding the risks associated with repetitive head impacts in the game of football.

181.   As a direct and proximate result of the NFLPA's negligent conduct, Plaintiffs have suffered physical injury. Plaintiffs seek the full measure of damages allowed under applicable law.

## COUNT VII
## <u>MEDICAL MONITORING</u>
### <u>(Against All Defendants)</u>

182.   Plaintiffs restate and incorporate by reference the preceding paragraphs set forth above as if fully set forth herein.

183.   Plaintiffs experienced repetitive traumatic brain impacts during their NFL careers that significantly increased their risk of developing neurodegenerative disorders and diseases, including but not limited to CTE, Alzheimer's disease, and other similar cognitive-impairing conditions.

184.   Repetitive sub-concussive and concussive head impacts during NFL practices and games have a microscopic and latent effect on the brain. Repetitive exposure to accelerations to the head causes deformation, twisting, shearing, and stretching of neuronal cells such that multiple forms of damage take place, including the release of small amounts of chemicals within the brain,

such as the Tau protein. Among other things, the gradual build-up of Tau protein—sometimes over decades—causes CTE.

185.    The game of football as played in the NFL, including both practices and game play, has exposed former players to hazardous conditions and out-of-the ordinary risks of harm. These repetitive head accelerations to which Plaintiffs were exposed presented risks of latent but long-term debilitating chronic illnesses which are not presented to the normal population. Absent Defendants' fraud and misrepresentations, Plaintiffs' exposure to the risks of harm as described above would have been materially lower or possibly non-existent. Defendants' fraud and misrepresentations prevented Plaintiffs from making a knowledgeable decision on continuing their careers.

186.    Accordingly, the repetitive head impacts sustained by professional football players in games and practices exposed professional football players, including Plaintiffs, to subtle and repetitive changes within the brain on the cellular level. For those reasons, the environment within which professional football players have sustained repetitive head impacts exposed them to substantive hazards.

187.    Depending on many factors, including the amount of the exposure to repetitive head impacts and the release of Tau protein, the player/victim will develop a range of subtle to significant neuro-cognitive changes over time.

188.    The latent injuries which develop over time and manifest later in life include but are not limited to varying forms of neuro-cognitive disability, decline, personality change, mood swings, rage, and, sometimes, fully developed encephalopathy.

189.    Defendants were fully aware of the danger of exposing all professional football players to repetitive head impacts, including the repetitive sub-concussive and concussive blows

that increase the risk to professional football players of, among other latent injuries, encephalopathy.

190.   As noted above, by its action and/or omissions and/or fraudulent conduct, Defendants further breached their voluntarily-assumed duty of reasonable and ordinary care to Plaintiffs by failing to provide current and former professional football players, including Plaintiffs, with necessary, adequate, and truthful information about the heightened risks of neurological damage that arise from repetitive head impacts during games and practices.

191.   As a direct and proximate result of Defendants' tortious conduct, Plaintiffs have experienced an increased risk of developing serious latent neurodegenerative disorders and diseases, including but not limited to CTE, Alzheimer's disease, and/or other and similar cognitive-impairing conditions.

192.   The latent brain injuries from which Plaintiffs suffer require specialized testing (with resultant treatment) that is not generally given to the public at large.

193.   The available monitoring regime is specific for individuals exposed to repetitive head trauma and is different from that normally recommended in the absence of exposure to this risk of harm.

194.   The medical monitoring regime includes, but is not limited to, baseline tests and diagnostic examinations which will assist in diagnosing the adverse health effects associated with football-related TBI. This diagnosis will facilitate the treatment and behavioral and/or pharmaceutical interventions that will prevent or mitigate various adverse consequences of the latent neurodegenerative disorders and diseases associated with the repetitive sub-concussive and concussive injuries that Plaintiffs experienced while playing professional football.

195.    The available monitoring regime is reasonably necessary according to contemporary scientific principles within the medical community specializing in the diagnosis of head injuries and their potential link to, *inter alia*, memory loss, impulse rage, depression, early-onset dementia, CTE, Alzheimer-like syndromes, and similar cognitive-impairing conditions.

196.    By monitoring and testing Plaintiffs, the risk that Plaintiffs will suffer further long term injuries, disease, and losses without adequate treatment will be significantly reduced.

197.    Plaintiffs therefore seek an injunction creating a Court-supervised, Defendants-funded medical monitoring program which will facilitate the diagnosis and adequate treatment of Plaintiffs for neurodegenerative disorder or disease. The medical monitoring should include a trust fund to pay for the medical monitoring and treatment of Plaintiffs as frequently and appropriately as necessary.

198.    Plaintiffs have no adequate remedy at law in that monetary damages alone cannot compensate them for the continued risk of developing long-term physical and economic losses due to concussions and sub-concussive injuries. Without Court-approved medical monitoring as described herein, or established by the Court, Plaintiffs will continue to face an unreasonable risk of continued injury and disability.

## COUNT VIII
## CIVIL CONSPIRACY
### (Against All Defendants)

199.    Plaintiffs restate and incorporate by reference the preceding paragraphs set forth above as if fully set forth herein.

200.    For decades, Defendants, along with the NFL and others who were employed by the NFL, including those who participated in the NFL MTBI Committee, acted in concert to perpetrate

the fraudulent concealment of the connection between repetitive TBI and long-term neuro-cognitive damage, illness, and decline.

201.     After a meeting of the minds, Defendants, along with those who participated in the concerted efforts referenced above, knowingly failed to disclose and/or made continuing misrepresentations of material fact that there was an absence of any scientific basis to believe that repetitive TBI created any known long-term neuro-cognitive risks to professional football players. That misconduct by Defendants exposed Plaintiffs to an increased risk of brain injury and was the proximate cause of Plaintiffs' brain injuries.

202.     Plaintiffs have suffered personal and pecuniary injuries as a result of Defendants' concerted activities.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment as follows:

A.       Granting Plaintiffs an award of fair and reasonable compensatory and punitive damages against Defendants, in an amount to exceed $25,000, exclusive of interest and costs;

B.       Granting an injunction and/or other equitable relief against Defendants and in favor of Plaintiffs for the requested medical monitoring;

C.       Granting an award to Plaintiffs of prejudgment interest and costs; and

D.       With respect to all counts, awarding Plaintiffs such other and further relief as may be appropriate.

## JURY DEMAND

Plaintiffs hereby demand a trial by jury on all matters so triable.

Respectfully Submitted,


**THE REGAN LAW FIRM, L.L.C.**

By: /s/ *Kevin E. J. Regan*
Kevin E. J. Regan     MO #32609 (*Admission Pending*)
1821 Wyandotte Street, Suite 200
Kansas City, Missouri 64108
816-221-5357
816-221-5236 FACSIMILE
thefirm@reganlawfirm.com


**SHAFFER LOMBARDO SHURIN**

By: /s/ *Richard F. Lombardo*
Richard F. Lombardo        MO#29478
911 Main Street, Suite 2000
Kansas City, Missouri 64105
816-931-0500
816-931-5775 - Fax
rlombardo@sls-law.com


**LANGDON & EMISON**

By*:  /s/ Brett A. Emison*
Brett A. Emison            MO Bar # 52072
911 Main Street
P. O. Box 220
Lexington, Missouri 64067
Telephone: (660) 259-6175
Facsimile: (660) 259-4571
brett@lelaw.com


**YONKE LAW LLC**

By: /s/ *Michael T. Yonke*
Michael T. Yonke, MO No. 42821 (*Admission Pending*)
myonke@yonke-law.com

Charles R.C. Regan, MO No. 66173 (*Admission Pending*)
cregan@yonke-law.com
908 Broadway, 4th Floor
Kansas City, Missouri 64105
(816) 221-6400
Facsimile (816) 888-5188